**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| |
|---|
| DEMERX, INC., |
| Plaintiff, |
| v. |
| ATAI LIFE SCIENCES, AG and ATAI THERAPEUTICS, INC. (f/k/a DEMERX IB, INC.), |
| Defendant. |

C.A. No. <u>1:25-cv-00321-UNA</u>

## **COMPLAINT**

Plaintiff DemeRx, Inc. ("DemeRx" or "Plaintiff"), by and through its undersigned counsel, hereby submits this Complaint against Defendants ATAI Life Sciences AG ("atai") and ATAI Therapeutics, Inc. f/k/a DemeRX IB, Inc. ("DemeRx IB"; collectively, "Defendants").

All admissions made in this Complaint are made as of the date of this filing, unless otherwise stated. Plaintiff reserves the right to further amend and/or supplement the Complaint. Plaintiff alleges for its Complaint herein against Defendants atai and DemeRx IB, upon personal knowledge as to itself and on information and belief as to all other matters, as follows:

### PRELIMINARY STATEMENT

1.     This action arises from Defendant atai's acquisition of DemeRx IB from Plaintiff under terms that included a potential earn-out of up to $8 million tied to performance milestones atai was obligated to pursue using commercially reasonable efforts defined in the parties' Stock Purchase and Framework Agreement ("SPFA"). Immediately after the November 6, 2023 closing, however, purchaser—Defendant atai—shelved DemeRx IB's drug and intellectual property,

closed the drug's clinical trial, terminated or reassigned every employee involved in the drug's development, and ceased all contact with Plaintiff.

2.      The drug in question, DMX-1002, is an oral dose formulation of ibogaine. Instead of properly developing DMX-1002, as Defendants promised, Defendants jettisoned it in favor of an intravenous ibogaine formulation that should be years and millions of dollars in clinical investment *behind* DMX-1002, with no appreciable superiority over DMX-1002. The speed with which Defendants plan to bring the competing intravenous formulation to market makes clear they planned to shelve DMX-1002 before even executing the SPFA.

3.      atai made numerous promises to Plaintiff within and without the SPFA to induce Plaintiff to enter into the SPFA. For example, atai promised new management for DemeRx IB, an ongoing advisory role for Plaintiff's CEO, careful patent maintenance, and that it would not encroach on Plaintiff's separate clinical work. Defendants have broken every one of those promises, which they never intended to keep.

4.      Defendants' misconduct constitutes fraud and multiple violations of the SPFA.[1] Had atai disclosed its true intentions to DemeRx, DemeRx would not have agreed to the SPFA.

**PARTIES**

5.      Plaintiff DemeRx, a clinical stage drug development company, is a Florida corporation with its principal place of business in Florida. Until the Acquisition, DemeRx advanced two molecules for the treatment of substance use disorders: ibogaine and noribogaine (a metabolite of ibogaine). Pursuant to the SPFA, DemeRx sold its interest in DemeRx IB, and the right to use and develop its ibogaine patents, to atai. Thus, DemeRx now focuses on advancing noribogaine.

---

[1]    Capitalized terms used but not defined herein have the meanings set forth in the SPFA.

6.     Defendant atai is a German stock corporation with its principal place of business in Berlin, Germany.  A party to the SPFA, atai is a clinical stage biopharmaceutical company focused on development of novel treatments for mental health disorders.

7.     Defendant ATAI Therapeutics, Inc., a subsidiary of atai, is a Delaware corporation. atai merged DemeRx IB, a party to the SPFA, into ATAI Therapeutics in late 2023 and made DemeRx aware of the transaction in early 2024.

## JURISDICTION

8.     This Court has subject matter jurisdiction over DemeRx's claims under 28 U.S.C. § 1332(a)(2) because atai is a foreign corporation, there is complete diversity between the parties, and the amount in controversy exceeds $75,000.

9.     This Court has personal jurisdiction over atai and ATAI Therapeutics pursuant to SPFA Section 9.12, in which the parties consented to exclusive jurisdiction in the state and federal courts located in the State of Delaware.

## FACTUAL BACKGROUND

**A.     DemeRx's Background, Formation, and Mission.**

10.     Millions of patients around the world suffer from drug and alcohol addiction. Alcohol and drug abuse "hijacks" the brain's reward centers, and for these patients, painful cravings, depression and anxiety experienced during early stages of abstinence often drive an intractable cycle of relapse.  For years, there has been no advancement by the pharmaceutical industry to bring to market non-addictive drugs to alleviate opioid withdrawal symptoms, diminish drug craving and improve mood to end relapse cycles.  One such experimental yet highly promising drug, in use by millions of patients worldwide, is ibogaine.

11.     Ibogaine is a naturally-occurring psychedelic product isolated from a West African shrub that has demonstrated rapid and sustained efficacy in treating opioid use disorder.  Open

label studies of ibogaine have demonstrated benefits in patients seeking to transition to sobriety by turning on neuroplasticity in addiction circuits of the brain. These changes bring about a rapid "reset," which shuts off the intense cravings and desire to use alcohol and drugs.

12.    Professor Deborah Mash, Ph.D., the current CEO and President of Plaintiff DemeRx, is one of the world's foremost scientific experts on ibogaine. She is also credited with the discovery of ibogaine's active metabolite, noribogaine—a non-hallucingenic but potent neuroplastogen with a promising future as an addiction pharmacotherapy for daily use. Dr. Mash is Professor Emerita of Neurology and Molecular and Cellular Pharmacology at the University of Miami School of Medicine. She has held uninterrupted NIH funding from the National Institute on Drug Abuse for over thirty years. Dr. Mash first obtained clinical trial approval by the federal Food and Drug Administration ("FDA") in 1993 for an investigator-initiated clinical Phase I safety and pharmacokinetic study of ibogaine in the USA. In 1996, Dr. Mash founded and directed Novoneuron Inc. to advance research and development of ibogaine and noribogaine. From 1996 through 2003, Dr. Mash conducted research and clinical development studies of ibogaine at a substance abuse treatment center to support medication development of the drug for opioid and other substance use disorders.

13.    In 2010, Dr. Mash co-founded DemeRx to advance clinical development of noribogaine, and served as its Director and Chief Scientific Officer from 2010 to 2013. Dr. Mash took over leadership of DemeRx in 2017 at the height of the opioid epidemic, bringing with her new management a strategic vision for the future clinical development of ibogaine and noribogaine.

14.     In 2022, DemeRx conducted a survey of board-certified medical providers treating opioid use disorders across the USA.  The survey showed significant interest in ibogaine as an alternative addiction therapy for patients suffering from opioid use disorder.

15.     DemeRx filed and prosecuted patents related to ibogaine and noribogaine, in the USA and across the world, secured the drug supply of ibogaine produced using Good Manufacturing Practices ("GMP") and advanced nonclinical studies to support drug product to market opportunity.

16.     atai, a clinical stage biopharmaceutical company focused on development of novel treatments for mental health disorders, was founded in 2018.  In May 2019, atai approached DemeRx to propose a joint venture to develop ibogaine and noribogaine as addiction medicines. atai representatives visited DemeRx in Miami, Florida that same month, reviewed DemeRx's scientific and clinical data, GMP manufacturing processes, and patents related to ibogaine and noribogaine, and expressed interest in working towards a joint venture agreement.  The parties negotiated that venture over the following months.

17.     In December 2019, DemeRx IB (ibogaine) and DemeRx NB (noribogaine) were incorporated as wholly-owned subsidiaries of DemeRx, formed for the purpose of facilitating the joint venture transaction between DemeRx and atai.  DemeRx and atai jointly created DemeRx IB, which was designed to use DemeRx's technical know-how, scientific and clinical data, and intellectual property to advance ibogaine and obtain regulatory approval to test ibogaine in clinical trials as a treatment for opioid use disorder.

18.     atai provided initial funding for the joint venture. Under their business model, atai was to provide DemeRx with clinical, non-clinical, project management, Chemistry, Manufacturing, and Control ("CMC"), patent, and regulatory support services billed to DemeRx

quarterly pursuant to the terms of a Master Services Agreement ("MSA").  atai assigned its former Chief Medical Officer to work with DemeRx.  atai directed DemeRx to use the patent prosecution services of their outside counsel.  atai also spent funds from their investment on the development of a digital therapeutic application for use with ibogaine therapy.

19.     atai's wholly-owned U.S. subsidiary, atai Life Sciences N.V., held its initial public offering in June 2021.

20.     The process for securing regulatory approval of a new drug involves multi-stage clinical trials.  The first stage typically involves healthy subjects, not patients suffering from the target condition (here, opioid use disorder) to monitor side-effects, starting with a low dose, and (if approved by regulator) increasing the dose incrementally to an amount expected to have the desired clinical efficacy.  This stage of testing is considered "Stage 1."  Stage 1 results are then presented to the relevant regulatory agency to review for safety and tolerability.  If the regulator finds the drug sufficiently safe, it may permit a "Stage 2" or "proof of concept" ("POC") clinical trial in patients suffering from the target condition to determine the treatment's efficacy.  A new drug cannot reach the stage of seeking approval for public use without promising Stage 1 data to support a Stage 2 approval for testing in human patient volunteers.

21.     Under DemeRx IB, DemeRx took the necessary steps toward developing an orally-administered capsule formulation of ibogaine, DMX-1002, and obtaining regulatory approval for testing in a Stage 1/2a protocol.  Clinical trial enrollment began, utilizing MAC Clinical Research Early Phase Unit ("EPU"), a Stage 1 center accredited by the United Kingdom's Medicines and Healthcare products Regulatory Agency ("MHRA"), located within and supported by the Manchester University Foundation Trust.

22.     On March 4, 2020, DemeRx requested a regulatory advice meeting to consider the protocol for DMX-1002's Stage 1 testing of ibogaine in the UK (the "DMX-201-IB" study).  The MHRA, which is equivalent to the FDA, provided advice and subsequently approved the study protocol for the Stage 1 arm of the protocol. The protocol detailed the study's proposed timeline, cohort sizes, and dosage amounts, among other factors.  On February 16, 2021, the MHRA approved the protocol, entitled: "A Phase 1/2a Study of Single-Dose Oral Ibogaine to Determine the Maximum Tolerated Dose (MTD) or Treat-to-Target Dose (TTD) in Healthy Volunteers (Stage 1) and to Evaluate the Efficacy and Safety of the MTD/TTD in Opioid-Dependent Subjects Seeking Medically Supervised Opioid Withdrawal (Stage 2)".

23.     DemeRx IB initiated its clinical trial at the height of the COVID-19 pandemic, which delayed subject recruitment and initiation of the study.  The primary objectives of the study were to: (1) define the safety and tolerability of ibogaine in Stage 1 by determining the dose-limiting toxicities ("DLT"), the maximum tolerated dose ("MTD"), and the recommended Stage 2 dose; and (2) determine the pharmacokinetic profile of ibogaine and noribogaine in healthy volunteers. These primary endpoints remained unchanged throughout the study, including enrollment and completion of two of three ascending dose cohorts within Stage 1.

24.     The MHRA acknowledged that this clinical research effort addressed an important public health concern stemming from the use of non-GMP grade ibogaine for opioid detoxification, which often occurs in unmonitored and unsafe clinical settings.  Today, online forums continue to promote ibogaine for opioid withdrawal management.  Despite the public testimonials and consumer views of the transformative benefits of ibogaine for patients, the unregulated use of the drug has led to concerns for patient safety.

25.     The Stage 1 dose escalation arm of DMX-201-IB was the first and only Good Clinical Practice ("GCP") study of GMP-grade ibogaine, which aimed to evaluate risks identified previously from case reports and uncontrolled studies.  Thus, the DMX-IB-201 study was important to inform the judgment of doctors and patients regarding potential safety risks and side effects which, if not recognized, may compromise patient safety in those who seek ibogaine as an alternative addiction treatment.

26.     DemeRx's and atai's ultimate goal for DMX-1002's Stage 1 clinical trial was to gather sufficient clinical safety and pharmacokinetic data to submit an Investigational New Drug ("IND") application to the FDA for approval of a Stage 2 POC clinical trial in the USA and/or to obtain regulatory approval to conduct the trial in another country.

**B.     atai Seeks to Acquire DemeRx IB While Making Critical (and False) Representations to DemeRx to Induce the Deal.**

27.     As DemeRx and atai worked together from 2020 through 2022, it became clear that the development of noribogaine would not be funded by atai.  During this period, the communication between the parties became more infrequent and the advancement of the noribogaine asset was not a priority for atai.  This arrangement became untenable as DemeRx prosecuted a patent portfolio for a diminishing noribogaine asset.  DemeRx recognized that the clinical advancement of noribogaine and ibogaine would be best served by each party focusing on one, rather than co-developing both molecules.

28.     Thus, in or around March 2023, DemeRx approached atai about acquiring full ownership of DemeRx IB and its related ibogaine patents and other assets related to the molecule. DemeRx's primary negotiator was Dr. Mash; atai's primary negotiators were Florian Brand (atai's CEO at that time), Dr. Srinivas Rao (atai's current co-Chief Executive Officer), and Ryan Barrett, Esquire (atai's General Counsel).

29.    On March 27, 2023, atai tendered a letter of intent ("LOI") outlining its proposal to acquire DemeRx IB.  The LOI proposed, *inter alia*, an initial cash payment of $5,000,000 to DemeRx, plus up to $11,000,000 of earn-out consideration to be paid in tranches upon the completion of three defined milestones in the development of DMX-1002.

30.    Dr. Mash executed the LOI, and the parties proceeded to due diligence.  atai was already intimately familiar with DemeRx IB—as its majority shareholder—and how promising DMX-1002 was as a treatment for substance abuse, as evidenced by the open label data and testimonials of thousands of patients who sought ibogaine treatment in other countries.  atai held three of the five director positions in the company and approved all decisions related to clinical trial applications and expenditures over $250,000.00.  Despite their controlling position of DemeRx IB, atai engaged in extensive due diligence of DemeRx IB's finances, assets, patents, and clinical and non-clinical operations in the months following the LOI's execution.

31.    After signing the LOI, DemeRx repeatedly raised the need for a transition plan and for a management team to be named to execute the DMX-1002 clinical development program under the guidance of atai's leadership.  To address these and other issues, atai organized an in-person meeting with DemeRx leadership in Boston, Massachusetts on July 12, 2023.  In preparation for that meeting, on July 11, 2023, atai emailed certain documents to DemeRx.  In those documents, atai expressed its clear commitment to reach the clinical development milestones to POC envisioned in the signed LOI.  Additionally, in the documents and meeting, atai represented that it had the key core capabilities needed to fully execute DMX-1002's clinical development plan to POC, which would be driven by atai's subject matter experts.  atai acknowledged that it had a highly experienced management team that successfully developed multiple FDA-approved drugs.  atai also acknowledged that a new CEO would need to be appointed for DemeRx IB after

Closing.  In response, atai proposed Dean Carson, Ph.D.—the Global Program Team Lead at atai, and who was already involved in the DMX-1002 program—for the role, and added him to DemeRx IB's board of directors, with all of which DemeRx wholeheartedly agreed.  atai echoed these promises in numerous subsequent communications with DemeRx prior to Closing.  The support atai committed to DMX-1002's development gave DemeRx comfort that reaching the milestones outlined in the LOI was a mutual goal and a virtual certainty.

32.    Meanwhile, work on DMX-1002 continued to advance.  By July 2023, atai's Dr. Kevin Craig, Senior Vice President of Clinical Development, had presented a substantial working draft Stage 2 POC study protocol intended to form the crux of an IND submission to the FDA. Furthermore, atai's Dr. Rao recommended both Parties move forward with such submission soon. Dr. Craig's protocol set July 2024 as the start date for Stage 2.  All of this activity between the parties underscored atai's desire to complete the Stage 1 study as quickly as possible to support the Stage 2 protocol submission.

33.    Before the SPFA could be executed, the transaction required approval by a majority of DemeRx's shareholders.  atai requested that, for confidentiality reasons, this approval occur outside of an ordinary shareholder meeting, and atai's General Counsel, Ryan Barrett, provided direction on the process.  Thus, Dr. Mash individually approached shareholders to explain the expected benefits of the SPFA, and repeated many of atai's promises to these shareholders to secure their required approval.

34.    The Parties comprehensively negotiated the terms of the SPFA, exchanging approximately 27 versions prior to its final form.

**C.    Acquisition Terms.**

35.    On October 2, 2023, the parties signed the SPFA and ancillary agreements. Pursuant to the SPFA's terms, however, the transaction did not close until over a month later.

36.     The SPFA provided $8,000,000 in Initial Consideration to be paid to DemeRx upon the Closing (defined as the third business day following satisfaction of all conditions set forth in SPFA Sections 1.3(b), 4, and 5.  Further, consistent with the executed LOI, Section 1.2(a) of the SPFA entitles DemeRx to Earn-Out Consideration upon achievement of two defined milestones directly related to the DMX-1002 program.

37.     Milestone 1 provides that DemeRx be paid $4,000,000 "upon receipt of an IND acceptance letter for the DMX-1002 proof of concept study at efficacious doses and with a primary endpoint defined as [substance abuse] relapse prevention (the '**IB POC Study**')" (emphasis in original).

38.     Milestone 2 provides that DemeRx be paid another $4,000,000 "upon the earlier of (1) receipt of safety, tolerability and efficacy results from the IB POC Study that are, in ATAI's view, (A) sufficient to conclude a favorable risk/benefit analysis for DMX-1002, and (B) supportive of continued development and commercialization efforts for DMX-1002 or (2) initiation of subsequent clinical study with DMX-1002 at any time following the conclusion of [the] IB POC Study."

39.     Both Parties understood—based upon their joint clinical development plans for DMX-1002 to date and general knowledge of the process for bringing new drugs to market—that completing the Phase 1 study in the United Kingdom was a necessary condition to submission of an IND application, and thus to the achievement of either Milestone.

40.     To assure atai would diligently develop DMX-1002 after Closing, in SPFA Section 5.5 atai agreed that, as a condition of Closing, DemeRx IB must have already executed an advisory services agreement with, and acceptable to, Dr. Mash.  This was intended to ensure Dr. Mash's expertise would continue to be utilized effectively toward achievement of the Milestones.

41.    atai's representations that Dr. Mash would continue to be involved in DMX-1002's development and that atai would provide the personnel and resources to achieve the Milestones were intended to convince DemeRx that atai's incentives were in line with DemeRx's. DemeRx reasonably reached that conclusion, in reliance on those representations, and agreed to a transaction structure in which a substantial portion of the consideration paid to DemeRx was embodied in the earn-out.

42.    Nevertheless, DemeRx negotiated for and insisted on a covenant (the "Earn-Out Covenant"), set out in Section 1.2(b), which provides:

> Following the Closing and until the earlier of (i) the seven (7) year anniversary of the Closing Date and (ii) the date [DemeRx IB] or ATAI provide a Discontinuation Notice (defined below) (the "**Earn-Out Period**") [DemeRx IB] and ATAI shall exercise Commercially Reasonable Efforts (defined below) directed to development and commercialization of DMX-1002, and shall not take any action or inaction for the primary purpose of, or that would reasonably be expected to directly prejudice, thwart or inhibit [DemeRx IB] from achieving the Milestones.

43.    Commercially Reasonable Efforts ("CRE") are in turn defined to mean

> that level of reasonable good faith efforts and resources commonly applied to carry out a particular task or obligation consistent with the general practice followed by the applicable Party and its Affiliates relating to other products or therapies owned by the relevant Person, or to which it has exclusive rights, which are of similar market potential at a similar stage in their development or product life, taking into account issues of safety and efficacy, product profile, the competitiveness of third party products in development and in the marketplace, supply chain management considerations, the proprietary position of the product or therapy (including with respect to patent or regulatory exclusivity), the regulatory structure involved, the profitability of the applicable product or therapy (including pricing and reimbursement status achieved), and other relevant technical, commercial, legal, scientific, regulatory or medical factors.

44.    If atai were to determine, however, "in the good faith exercise of its business judgment and without regard to the Earn[-]Out Consideration" that the Milestones could not be achieved despite exercising CRE, the SPFA permitted atai or DemeRx IB to issue a Discontinuation Notice to DemeRx "reasonably promptly" after taking affirmative steps toward

discontinuing development of DMX-1002 and "specifying in reasonable detail the rationale for" doing so.

45.     SPFA Section 1.2(h) provides procedures to govern a dispute over a Discontinuation Notice.  If DemeRx issues written notice disputing atai's determination that the Milestones could not be achieved through CRE, the parties' Senior Executives are required to first negotiate in good faith in an attempt to reach agreement.  If the Senior Executives cannot agree, the dispute is then submitted to an expert Independent Reviewer "who is qualified in evaluating clinical studies of the type and in the field relevant to the Milestones" to assess atai's determination.  If the Independent Reviewer finds DemeRx IB or atai breached its obligations in the SPFA by discontinuing DMX-1002—*i.e.*, the Milestones *could* have been achieved by applying CRE—atai must "immediately pay … the full amount of any previously unpaid Earn-Out Consideration," plus interest.

46.     DemeRx negotiated heavily for this dispute resolution procedure, which was intended as a precautionary measure to prevent atai from evading its CRE obligation or discontinuing DMX-1002 without adequate recourse by DemeRx.  However, the dispute resolution procedure in SPFA Section 1.2(h) does not apply unless and until atai issues a Discontinuation Notice.

47.     As a further assurance of atai's CRE, and "[t]o ensure maximum alignment and awareness" between the Parties, SPFA 1.2(d) gave DemeRx the right to nominate an observer at the meetings of DemeRx IB's board of directors.  The DemeRx Observer would have the right to participate in and receive all material and information related to such meetings with respect to DMX-1002.

48.    In connection with the SPFA, the Parties executed a Patent Assignment whereby DemeRx assigned and transferred its ibogaine patents and related inventions to DemeRx IB.

49.    However, the Parties also executed an accompanying License Agreement, whereby DemeRx IB granted back to DemeRx certain exclusive and non-exclusive licenses in certain patents and patent applications (the "Patent Family").

50.    Section 3.1 of the License Agreement obligates atai, through DemeRx IB, to prosecute and maintain the Ibogaine Patents or, if it chooses to abandon prosecution of certain Ibogaine Patents, to promptly notify DemeRx so it may elect to prosecute and maintain the corresponding patents.  These obligations are critical because DemeRx IB's failure to prosecute the Ibogaine Patents may result in the loss of DemeRx's rights in future Noribogaine Patents that could have derived from such abandoned patents.

51.    Through the Patent Assignment and License Agreement, the Parties intended to keep the Patent Family under a single ownership while allowing both parties to continue seeking future patent protection relevant to the parts of the family underlying their respective work.  Of course, this meant that the right to control the prosecution of *non*-ibogaine aspects of the Patent Family (both past and future) would remain with DemeRx.

52.    In reliance on the reasonably-defined Milestones, DemeRx Observer rights, Dr. Mash's continued advisory capacity, atai's representations that it would properly staff and resource DemeRx IB, and the Earn-Out Covenant, DemeRx reasonably believed one or more Milestones would be achieved and Earn-Out Consideration would be paid.

**D.    Between Execution and Closing, atai Prepares to Abandon DMX-1002 While Concealing its True Intentions from DemeRx.**

53.    Between the SPFA's execution and Closing (the "Pre-Closing Period"), the Parties diligently worked together to fulfill the conditions for Closing and, as it appeared to DemeRx, to

14

plan for DMX-1002's continued development post-Closing. To that end, the parties communicated constantly, frequently met, and shared information. atai's Dr. Craig also scheduled and held regular meetings with Dr. Mash.

54.     During the Pre-Closing Period, atai secured from DemeRx connections to the key vendors supporting manufacture of ibogaine: harvesting raw material in Ghana, processing raw material into ibogaine precursor, transforming precursor into ibogaine hydrochloride and the storage of active pharmaceutical ingredient powder for use in the upcoming clinical trials.

55.     atai's conduct throughout the Pre-Closing Period indicated to DemeRx its firm commitment to take charge of DMX-1002 development after Closing, including, most importantly, diligent preparation to complete the Phase 1 trial (scheduled to re-start in March 2024) with an eye toward imminent IND submission. For example:

a.     The day after execution of the SPFA, October 3, 2023, atai discussed the plan to finish the enrollment of cohort three of the clinical trial in the United Kingdom and to begin enrolling participants to complete the Phase 1 study.

b.     On October 4, 2023, atai's Sarah Popham asked Dr. Mash for leads for a regulatory consultant to prepare for DMX-1002's POC strategy in the USA. This indicated to Dr. Mash—and DemeRx as a whole—that atai was committed to completing the Stage 1 study as a requirement for a Type B advice meeting and the successful IND submission.

c.     Dr. Mash had enlisted the cooperation of an operating ibogaine treatment clinic in Cancun, Mexico to obtain cardiac safety data to further support testing in patient volunteers. On October 5, 2023, atai asked Dr. Mash for an introduction to collaborate with that clinic on real-world cardiac safety research. Dr. Mash made the introduction, believing it would serve the long-term success of DMX-1002, and atai continued

communicating with the clinic throughout the pre-Closing period (always including Dr. Mash).

      d.    On or around October 14, 2023, the Parties finalized an agreement with Certara USA, Inc., a drug development software specialty organization, to perform modeling for pre-clinical and clinical DMX-1002 data. Work with Certara was ongoing through Closing. DemeRx provided clinical data from a study of noribogaine in healthy volunteers to support this effort.

      e.    On October 17, 2023, Dr. Craig asked Dr. Mash for recommendations for invitees to an advisory board meeting to be held in December 2023 at an annual meeting of the American Academy of Addiction Psychiatry, "to provide strategic advice on the value proposition and positioning of DMX-1002 and its proposed development path for oral dosing of patients under full medical monitor."

      f.    On October 19-20, 2023, atai corresponded with the company producing the active ingredient for ibogaine capsules, making clear atai needed the material on-hand in time to dose cohort 3.

56.    Throughout the Pre-Closing Period, Dr. Mash repeatedly notified atai of the urgency in meeting before Closing to ensure enrollment of subjects for cohort 3 would commence on time. In response, Dr. Rao assured Dr. Mash that atai leadership had assumed oversight of the clinical trial, and that subject enrollment for cohort 3 was on schedule.

57.    Prior to the Pre-Closing Period, DemeRx collaborated with atai to begin exploring the earliest stages an intravenous formulation of ibogaine (separate from the oral-dose formulation, DMX-1002). No animal or human studies had ever been conducted using an intravenous formulation. Thus, the parties understood that, if ever pursued in parallel with the oral dose testing,

the intravenous formulation would be years behind DMX-1002's clinical development. The results obtained from preliminary modeling data and Dr. Mash's prior research did not predict superior cardiac safety for the intravenous formulation, compared to DMX-1002.

58.     Thus, at this early stage of scientific review, atai never notified or directed DemeRx to pursue an intravenous dose formulation prior to Closing. In fact, Dr. Mash had presented atai with an intravenous formulation contract, which included pre-formulation testing to allow studies in animals to be initiated in parallel with the oral dose studies in human. atai's Dr. Carson explicitly told Dr. Mash not to execute the contract. At no time before or after Closing did atai indicate it would delay or terminate DMX-1002's development to pursue an intravenous treatment.

59.     Throughout the Pre-Closing Period, atai representatives were cordial, cooperative, and responsive concerning plans for DMX-1002. Indeed, Drs. Rao, Craig and Carson, among other staff, repeatedly represented that—in atai's capable hands—DMX-1002 was on track to achieve advancement of ibogaine toward the Milestones as written in the SPFA. Dr. Rao also stressed to Dr. Mash that he truly wanted atai to be first to make an IND submission to the FDA for ibogaine therapy, cementing his (and atai's) apparent commitment to meeting the Milestones.

60.     atai paid the Initial Consideration of $8,000,000 to DemeRx when the Acquisition closed on November 3, 2024. Given atai's apparently close collaboration and excitement about DMX-1002's prospects, its future looked bright to DemeRx. Indeed, only a week after Closing, on November 10, 2023, Nature Medicine published a robust study of magnesium-ibogaine therapy in veterans with traumatic brain injuries that demonstrated the safety and efficacy of oral dose ibogaine formulations. atai knew about this publication, which should have supercharged atai's efforts to develop DMX-1002. Instead, atai's efforts ceased altogether.

**E.    atai Launches a Campaign to Shelve DMX-1002 While Endangering and Encroaching Upon DemeRx's Patent Rights.**

61.    Immediately and suddenly upon Closing, atai implemented a multi-faceted and premeditated scheme to deprive DemeRx of its Earn-Out Consideration by ceasing development of DMX-1002 and pursuing the nascent intravenous ibogaine therapy (IBX-210) in its place, without any justification supported by the SPFA—indeed, without ever attempting CRE to advance the groundbreaking therapy the Parties had spent years of hard-fought effort to develop together.  Key components of atai's plan included: (a) canceling cohort 3 enrollment and ending the Stage 1 clinical trial before completion; (b) terminating or reassigning all atai staff who worked on DMX-1002; (c) reallocating to IBX-210 resources atai had promised for DMX-1002; (d) ignoring information requests from DemeRx intended to ensure its patents would not lapse; (e) barring a DemeRx Observer from attending DemeRx IB's board meetings or receiving related materials; (f) dismantling DemeRx IB; and (g) shutting Dr. Mash out of DMX-1002 altogether. On information and belief, atai's misconduct continues to the present day.

62.    At no time before the SPFA's execution or Closing did atai disclose to DemeRx its intention to do any of these things.  Indeed, the scheme contradicted representations by Ryan Barrett to Dr. Mash and others, not to mention breached numerous provisions of the SPFA and accompanying agreements.  Dr. Mash was assured by Ryan Barrett that "We anticipate wrapping up this painstaking process in the coming month or two, and once completed, we will notify you so that you can ensure that [DemeRx]'s Board observer can observe the relevant portion of Merged OpCo's Board meetings as per the Transaction Docs."

63.    The extraordinarily close proximity of atai's misconduct to Closing shows atai knew its pre-Closing representations, including the Earn-Out Covenant, were false when made.

64.    Within days of Closing, atai's Senior Director of Clinical Operations, who was supposed to be the program lead for DMX-1002's going forward, started cutting Dr. Mash out of his communications with the U.K. vendor running the Stage 1 clinical trial.  And that was only the beginning.

65.    Dr. Craig immediately cancelled all future scheduled meetings with Dr. Mash and atai's operations personnel, supposedly to give atai time to decide how to proceed with the rest of the Stage 1 clinical trial.  However, atai personnel also ceased responding to requests for information and updates from Dr. Mash and others at DemeRx.  Indeed, as DemeRx later learned, atai management instructed its staff to cease communicating with DemeRx and Dr. Mash.

66.    By November 13, 2023, multiple vendors supporting DMX-1002 had reached out to DemeRx seeking review of study reports for existing projects and non-payment of invoices, among other issues.  Dr. Mash directed the vendors to contact atai in the future, and immediately raised the issues with atai; but on information and belief, atai did not address them.

67.    atai refused to appoint a new CEO for DemeRx IB, or any other senior managers, as promised pre-Closing.  Further, as DemeRx later learned, key employees who had been involved in development of DMX-1002 were laid off or reassigned by atai.  atai issued a press release on January 4, 2024, which reported: "atai Life Sciences Announces Strategic Investment in Beckley Psytech to Accelerate the Clinical Development of Short-Duration Psychedelics[.]"  atai's collaboration with Beckley signaled its investment in IBX-201 over DMX-1002.  One by one, key people with knowledge of the DMX-1002 program left atai as atai downsized in the wake of the press release.

68.    On November 24, 2023, Dr. Mash asked atai's in-house counsel for confirmation that atai had taken over annuity payments to maintain the intellectual property it acquired via the

Patent Assignment.  atai responded that its outside counsel would handle the IP portfolio, but evaded the question about annuity payments.  Shortly thereafter, atai's in-house patent counsel sent a courtesy email to Dr. Mash confirming his departure from atai.

69.    On December 4, 2023, DMX-1002's program lead provided an update to Dr. Mash, saying atai's executive team had finalized the plan for the Stage 1 study.  atai did not inform Dr. Mash what that plan was, and would not share anything further.  On information and belief, atai intended this so-called "update" to allay Dr. Mash's justified suspicion that atai was not going to use CRE to develop DMX-1002 while concealing its true plans.

70.    On November 27 and December 11, Dr. Mash insisted on review and approval of a final report of DMX-1002 cardiac data modeling that was crucial for making an IND submission. However, atai responded that the report was not a priority.

71.    Dr. Mash sought to submit a grant application for ibogaine research funding that would assist DemeRx IB, and for which it was eligible.  However, the application could not be completed or submitted because atai management had "gone radio silent" on next steps concerning the grant ever since Closing, as noted in an email from Dr. Mash to atai's CEO on December 22, 2023.

72.    On January 15, 2024, atai was presented with an immediate opportunity to collaborate with the clinic in Cancun, Mexico to collect cardiac safety data for DMX-1002, which would be a key step towards IND submission.  After several weeks, atai inexplicably declined.

73.    On January 18, 2024, atai finally responded to one of Dr. Mash's update requests by stating there was no update to give.  Despite contracting with Dr. Mash in an advisory role, atai persistently refused her access to information on which she could advise to advance DMX-1002.

74.    By February 21, 2024, atai's delay in re-starting the Phase 1 clinical trial had allowed available DMX-1002 doses to expire, requiring re-starting the bespoke supply chain DemeRx had assembled for ibogaine capsules.  atai, though, appeared to show no interest in doing so.

75.    Instead, as DemeRx later learned, atai closed out the approved Phase 1 clinical trial without notice to DemeRx, which had been scheduled to start enrolling subjects in early 2024 to begin cohort 3 in March 2024—directly contradicting atai's pre-Closing representations that enrollment would proceed as scheduled.  Dr. Mash continued to receive emails from vendors associated with the clinical trial requesting clarification and directions because atai was not communicating with them, but did not find out until later why this was happening.

76.    By February 27, 2024, DemeRx remained in the dark about DMX-1002's development.  However, in consideration of the parties' prior working relationship, Dr. Mash requested a small, 0.5 gram sample of ibogaine from atai to validate a bioanalytical method for noribogaine to advance DemeRx's separate work.  In response, atai proposed an exchange of ibogaine for noribogaine materials between the parties.  atai represented it needed significant gram quantities of noribogaine for preclinical work related to ibogaine.  DemeRx agreed, but requested further information to justify atai's requested amount which, if purchased separately, would be more than $20,000.00.  atai's intended use of the noribogaine was unclear, given the terms of the SPFA.  Dr. Mash asked for clarification, which was denied, so no materials exchange took place.

77.    On February 29, 2024, DemeRx's outside intellectual property counsel notified DemeRx that an annuity payment for one of the ibogaine patents assigned to atai was due and remained unpaid.  The SPFA obligated atai to handle such payments; Dr. Mash had pressed atai for confirmation such payments would be timely made by atai, without response by atai.  Dr. Mash

forwarded the annuity payment notification to atai's in-house intellectual property counsel and Ryan Barrett, accompanied by yet another reminder of atai's contractual obligations. However, since atai's in-house IP counsel was leaving the company, no one at atai was responsible for ensuring timely patent portfolio maintenance, as required. It seemed atai had no interest in upholding its obligations to DemeRx under the License Agreement and, in turn, threatened to endanger DemeRx's future rights to certain claims filed in the divisional Noribogaine Patents named in the parties' transaction documents.

78.     In response to these actions by atai, on March 5 and May 7, 2024, Dr. Mash made reasonable requests to Ryan Barrett for discussions and information regarding clinical data, trial plans, patent prosecution issues surrounding ibogaine and noribogaine, and the fact that no DemeRx Observer had been permitted to take part in board meetings. In response, Barrett acknowledged all those issues existed and informed Dr. Mash that DemeRx IB had been dismantled and merged into other atai subsidiaries and its board no longer existed to hold meetings that could be observed. Otherwise, Barrett did not meaningfully respond to Dr. Mash's requests, and instead made hollow representations—unsupported by any evidence—that atai was "following [its] obligations under the transaction documents."

79.     But this was not true, and atai knew it. On March 28, 2024, atai's U.S. affiliate, ATAI Life Sciences N.V. ("atai N.V."), filed its annual 10-K report with the Securities and Exchange Commission for the period ending December 31, 2023. That filing revealed for the first time atai's development of IBX-210, "an intravenous formulation of ibogaine[,]" and that atai "**was _previously_ developing DMX-1002, an oral formulation of ibogaine**" (emphasis added). atai N.V. confirmed these facts during an investor earnings call held around the same time. In short, atai publicly admitted it had ceased development of DMX-1002 **before the end of 2023**,

and within two months of Closing. And yet, as of the date of filing this Complaint, atai has not issued a Discontinuation Notice to DemeRx, thereby intentionally denying DemeRx access to the expert-led dispute resolution procedure it bargained for in SPFA Section 1.2(h).

80.     atai must have begun development its new intravenous formulation before Closing, without DemeRx's knowledge. At the time of Closing, DemeRx IB had no vendor agreements in place to develop and manufacture an intravenous dosage form of ibogaine. Conducting such formulation research would be at an early stage of development at atai, and represent the beginning of an entirely new drug development process for ibogaine. And yet, on March 28, 2024—the day of its 10-K filing—atai issued a press release stating it anticipated initiating a Phase 1/2a study of IBX-210 for the treatment of opioid use disorder in the second half of 2024.

81.     Shelving the oral dose formulation of ibogaine to advance an intravenous form would cost millions of dollars for the completion of pre-formulation studies, animal testing for safety and pharmacokinetic analyses, and stability testing for product release, all of which could not possibly be completed solely within the post-Closing period to date. With the limited funds available to atai after Closing, and in the wake of new investments and massive reorganization, Defendants clearly chose IBX-210 over DMX-1002 before signing the SPFA.

82.     atai N.V.'s 2023 10-K also revealed that, at Closing, atai did not believe the Company was likely to ever achieve a Milestone, contradicting all its pre-Closing representations to DemeRx. Specifically, the 10-K stated that, at the Closing Date, the entire "earn-out consideration was recorded [by atai] as a liability" valued at only "$1.3 million"—far short of the $4,000,000 Earn-Out Consideration owed for achievement of just the first Milestone ($8,000,000 for both Milestones).

83. In addition, at least as early as July 2023, Dr. Craig had prepared a working draft of the POC study design, and atai was aware of Dr. Srinivas Rao's recommendation to move forward with an IND submission for DMX-1002 in the U.S.—acceptance of which would satisfy the first Milestone.

84. It stands to reason that if atai considered that no Milestone was likely to ever be achieved as of the Closing, the only reason for atai's acquisition of DemeRx IB would have been to shelve DMX-1002 in favor of developing IBX-210 instead.

85. Further, in atai N.V.'s 10-Q filed with the Securities and Exchange Commission on November 14, 2023—less than two weeks after Closing—atai disclosed the Acquisition as a Subsequent Event. However, atai chose not to disclose its valuation of the Earn-Out Consideration and waited more than four additional months to include it in the 10-K.

86. On information and belief, atai did this to conceal its true plans from DemeRx for as long as possible.

87. Finally, as further evidence of atai's lack of cooperation and true intent, DemeRx recently learned that atai is attempting to patent around DemeRx's noribogaine program by filing at least two patent applications directed to ibogaine and noribogaine prodrugs. Not content with undermining DMX-1002, atai is now encroaching upon DemeRx's ability to develop its own noribogaine products.

**F.    atai Wrongfully Denies DemeRx's Right to Further Assurances and Rejects DemeRx's Demand for Indemnification.**

88. On June 11, 2024, DemeRx issued a formal demand to atai, pursuant to Section 6.7 of the SPFA, seeking documents and information that would show whether atai was exercising CRE or not. atai responded to the demand on June 26, 2024 by denying DemeRx's request.

Further, atai confirmed no board meetings have been held since Closing that concerned DMX-1002—a clear sign atai has discontinued its development.

89.     Despite atai's obvious and immediate abandonment of DMX-1002, neither atai nor DemeRx IB ever issued a Discontinuation Notice to DemeRx, making the dispute resolution procedure in SPFA Section 1.2(h) unavailable to DemeRx.  Thus, in accordance with Section 7.3(iii) of the SPFA, DemeRx delivered to atai a Direct Claim Notice on August 2, 2024, seeking indemnification from atai pursuant to Section 7.3(ii) of the SPFA, based upon the matters described above, for up to $16 million and rescission of the SPFA and accompanying agreements. atai rejected DemeRx's demand for indemnification on September 3, 2024.

### COUNT I
**(Contractual Indemnification, Article VII of the SPFA; Breach of the SPFA)**

90.     Plaintiff incorporates the foregoing allegations as if fully set forth here.

91.     The SPFA is a binding and enforceable contract among Defendants and Plaintiff DemeRx.

92.     Section 7.1(ii) of the SPFA provides that atai "shall save, defend, indemnify and hold harmless DemeRx and its Affiliates and their respective officers, directors, employees, agents, successors and permitted assigns (collectively, the "**DemeRx Indemnified Parties**") from and against any and all Losses actually incurred by any of the DemeRx Indemnified Parties to the extent directly resulting from: … any breach by ATAI of, or failure of ATAI to comply with, any covenant, obligation or agreement contained in this Agreement[.]"

93.     Defendant atai breached the SPFA by refusing to indemnify Plaintiff DemeRx.

94.     Defendant atai breached the SPFA, including the indemnification provision set forth in Article VII, by breaching its Earn-Out Covenant in SPFA Section 1.2(b).  DemeRx has

not issued a Discontinuation Notice for DMX-1002, nor have seven years passed since Closing. Thus, the Earn-Out Period is ongoing, and the Earn-Out Covenant in turn remains in force.

95.     As detailed above, atai breached the Earn-Out Covenant by failing to undertake CRE to develop DMX-1002, and by taking numerous actions and inactions (detailed above) for the primary purpose of, or that would reasonably be expected to directly prejudice, thwart, or inhibit achievement of the Milestones.  Such actions, policies, and practices began immediately after Closing and, on information and belief, continue to the present day.

96.     Plaintiff is entitled to indemnification for all losses resulting from Defendants' misconduct.

97.     As a direct and proximate result of Defendants' breaches of the SPFA, Plaintiff DemeRx has been injured.  In accordance with Section SPFA 1.2(h), Plaintiff DemeRx is entitled—at minimum—to contract damages of $8 million (the value of the Milestone payments), plus interest.

98.     Alternatively, if this Court grants Plaintiff DemeRx's request for equitable rescission (discussed *infra*), Plaintiff is entitled to damages in the amount of the value by which DemeRx IB and DMX-1002 have decreased in value as a result of Defendants' misconduct, as measured at the time of rescission.

## COUNT II
### (Contractual Indemnification, Article VII of the SPFA; Breach of License Agreement)

99.     Plaintiff incorporates the foregoing allegations as if fully set forth here.

100.     The License Agreement is a binding and enforceable contract among Defendants and Plaintiff.

101.    Section 7.1 of the License Agreement provides that "[a]ll disputes, controversies or differences which may arise between the Parties hereto or for the breach of any of the terms hereof shall be referred to and settled in accordance with the" SPFA.

102.    Section 7.1(ii) of the SPFA provides that atai "shall save, defend, indemnify and hold harmless DemeRx and its Affiliates and their respective officers, directors, employees, agents, successors and permitted assigns (collectively, the "**DemeRx Indemnified Parties**") from and against any and all Losses actually incurred by any of the DemeRx Indemnified Parties to the extent directly resulting from: … any breach by ATAI of, or failure of ATAI to comply with, any covenant, obligation or agreement contained in this Agreement[.]"

103.    Thus, Defendant atai breached the License Agreement by refusing to indemnify Plaintiff DemeRx.

104.    By failing to prosecute the ibogaine patents or promptly notify DemeRx of its intention to abandon such patents, atai breached Section 3.1 of the License Agreement.

105.    Plaintiff is entitled to indemnification for all losses resulting from Defendant atai's misconduct.

## COUNT III
### (Fraudulent Inducement)

106.    Plaintiff incorporates the foregoing allegations as if fully set forth here.

107.    As explained here, prior to Closing, Defendant atai, through its representatives Dr. Srinivas Rao, Ryan Barrett, and Dr. Kevin Craig, among others, knowingly made materially false representations and omissions of material facts regarding atai's plans for DMX-1002 and DemeRx IB after Closing.  Defendant atai also falsely committed to contract covenants in which it promised to exercise CRE and not take any action or inaction for the primary purpose of, or that would reasonably be expected to directly prejudice, thwart, or inhibit achievement of the Milestones and,

thus, payment of the Earn-Out Consideration. Defendant atai also falsely committed to (1) an advisory services agreement with Dr. Mash when, in fact, atai had no intention of involving Dr. Mash in DMX-1002's development; and (2) the dispute resolution procedure in SPFA Section 1.2(h), when atai intended to avoid its application by withholding a Discontinuation Notice. Such misrepresentations were made with the intent that DemeRx would rely to its detriment which, in fact, DemeRx did by entering into the SPFA and accompanying agreements, selling its interest in DemeRx IB and assigning its ibogaine-related patents to atai.

108.    As a direct and proximate result of Defendant's fraudulent statements and omissions, Plaintiff has been damaged by, among other things, agreeing to an earn-out in lieu of additional up-front consideration and assignment of valuable patent rights, when, had Plaintiff known the truth, it would not have agreed to the Acquisition at all.

109.    Due to Defendant atai's fraud, Plaintiff DemeRx lacks an adequate remedy at law. Plaintiff requests equitable rescission of the SPFA, Patent Assignment, License Agreement, and all other agreements related to or contemplated by the SPFA, so that DMX-1002 can be developed to its full potential under DemeRx's guidance.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff DemeRx respectfully requests that this Court: (i) award any and all relief requested by Plaintiff, (ii) deny any and all relief requested by Defendant atai, (iii) award Plaintiff its costs and expenses, including reasonable attorneys' fees, incurred in prosecuting this action, and (iv) award such other and further relief as this Court may deem just and proper.

**BALLARD SPAHR LLP**

*Of Counsel*:

Matthew G. Kussmaul *(PHV forthcoming)*
Raymond Nguyen *(PHV forthcoming)*
Ballard Spahr LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Telephone: (215) 665-8500
KussmaulM@ballardspahr.com
NguyenR@ballardspahr.com


Dated: March 13, 2025

*/s/ Elizabeth S. Fenton*
Elizabeth S. Fenton (No. 5563)
919 N. Market Street, 11th Floor
Wilmington, DE 19801-3034
Telephone: (302) 252-4465
Facsimile: (302) 252-4466
Email: FentonE@ballardspahr.com


*Attorneys for Plaintiff DemeRx, Inc.*